Good morning, Your Honors. Thomas Hudson on behalf of Brett Levy. I hope to save five minutes for rebuttal. And I plan to focus this morning on the issue concerning the size of the punitive damages award. Although I may touch on it in rebuttal, I'm not planning to discuss the cross appeal issues unless the court has questions or thinks that would be helpful this morning. Is our review de novo? It is on the constitutional issue, Judge Fletcher. And on that issue specifically, I intend to address two main points. First, that the district court erred by failing to apply what we've called the constitutional maximum principle. And second, that under the correct analysis, the jury's punitive damages award is not constitutionally infirm. Turning to the first issue. How do you go about deciding what the constitutional maximum is? Judge Fletcher, it involves a number of criteria. And sort of first and foremost, I think it's important whenever asking that question, and whenever before a court goes and interferes with a jury's award, to step back and recognize what we're talking about here, and that's due process. BMW, State Farm, the only reason courts are involved in this business of interfering on constitutional grounds with the jury's award is the due process clause. And the bottom line inquiry is that a jury's punitive award has to be so grossly excessive that it would be unfair as a matter of due process to impose it on the defendants because there's a problem with notice. And in this case, we submit, there's never been an issue with respect to notice with respect to the size of this award. And then more specifically, when you're making this inquiry about where is this line, does the jury's award cross the line, and that's the first inquiry. If it doesn't, of course, the court need not decide where the constitutional maximum is. If it's below it, the inquiry is over. You're starting with punitive damages, but in making this kind of a determination, don't we have to start with the validity of the compensatory damages? Yes. You mean the emotional and whether there's punitive liability, the cross appeal issues. So you're starting at one end of the spectrum, but I think you have to start at the other end, don't you? Well, and I'd be happy to, if I can't speak about those issues, I think there's on the punitive liability, for example, there's ample evidence supporting the jury's findings. And the defendants make the point about you need more than mere bad faith. I suspect that what Judge Fletcher is talking about is that if you're going to get to the ratio of punitive to compensatory, you've got to have your baseline first. Correct. Yeah. And again, and please tell me if I should address those cross appeal issues, but you've got to have the ultimately, you've got to do process. Then what BMW, State Farm, and of course this Court in the Planned Parenthood case has talked about is then you look at these factors. And the purpose of the factors, the so-called BMW factors, again goes to notice. And what Planned Parenthood did in a useful way is brought, is set forth what was called a rough framework. And that really brought further clarity to where this constitutional maximum might be in a particular case. And that's important because what it did is it helps courts to act on the basis of principle rather than picking an arbitrary number out of a hat. And what Planned Parenthood said is that in a case where you have egregious conduct, courts should not interfere with the jury's award if it falls within a single digit ratio. If the conduct's less egregious, then a ratio, the court should interfere if we have a ratio within the 4 to 1 range. So let's talk about the specifics in this case. First, what we have in this case is a single digit ratio. It's approximately 7 to 1. Then if you look at the conduct in this case, it falls at the high end of the reprehensibility scale. And let me just again step back on that issue. One of the difficult things about this case we submit is that the conduct is so bad and so egregious. Well, if you're talking about egregious conduct, I mean, take Planned Parenthood. You had people whose lives were being threatened. I mean, it wasn't quite violence, but it was clearly communicated, substantiated risk of getting killed. Okay? That's egregious. I agree. It's pretty much in the top end of egregious. Here you had conduct which I think, at least for this purpose, we'll acknowledge, was inappropriate and supported a punitive damage award. So what the district court who sat there found. Correct. But bottom line is it caused your client to have angst for about 2 or 3 months for which he got an extraordinary amount of money. So egregious, I mean, bad, wrong, sure. Egregious, I don't see how in the world you can even begin to get egregiousness up at the Planned Parenthood level. Well, Your Honor, let me talk about that, because what I think you've articulated there is the defense argument and the defense characterization of the evidence. But we have to. What I'm articulating to you is my view. And I appreciate that. So that's why I'm doing it. And let me respond to that. Okay. What we have here, and let's put this in context. I said I really do think the hard thing about this case is that it's so bad, it's hard to get your mind around it. But what we have here first is a company that set out and targeted a highly vulnerable population, disabled persons, to terminate their policies to meet our official claim-closing goals. They specifically targeted Dr. Levy's policies pursuant to that scheme. Then what we know in addition is you look at the claims file. They searched hard to find some basis to justify terminating his claim. They then did terminate his claim. And they did so notwithstanding knowing that, one, he was clearly entitled to benefits, two, that he was in an extremely vulnerable position at that time in his life, that his medical doctors uniformly agreed that trying to return him to dentistry might literally push him off the edge. And their own IME doctor called this idea of returning him to dentistry an experiment and indicated that it might be a dangerous experiment. They knew when they sent the letter that he was at a high risk of relapse and that he was at least at some risk for suicide. That's the circumstances under which they sent the letter. And in fact, harm happened to him. That letter changed his life in a dramatic way. And the jury saw that he was a changed person because of that. Now, the defendants say, look, we never missed a benefit payment. Well, that dramatically misses the point in a big way. They intended to never pay him another benefit. They intended for him to go away. And the only reason that they continued to eventually make benefits is not because they fessed up and said, you know what, we screwed up, we take responsibility. It's because they tried to cover up their wrongdoing. They knew it was so bad that they ultimately denied terminating the claim when it was clear that that is what had happened. And I'd be happy to talk about the pay system and some of this other evidence that's been a little. I can tick it off just as well as you can. Okay? However, that entirely justifies a punitive damage award. I don't have any quarrel with that. But in terms of the constitutional maximum. And that's what we're talking about. That is what we're talking about. And we're talking about the district judge who sat there through the whole thing and said, you know, a million five is just it. The district judge, Judge Reimer, when you look at the record, the district judge believed he had discretion. He didn't. The district judge believed that he could set the punitive damages award below the constitutional maximum. No, he didn't. The district judge has actually got two different problems before him, right? He's got a basic amount of punitive damages and whether that's justified or not. And then he's got a question about whether that amount remitted down is constitutionally permissible. And as I read what Judge McEnany did, he said, no way is $15 million appropriate. And I think a million five is. And a million five is constitutionally acceptable. Now, if you want to really quarrel with it, I might propose to you that a million five is exaggerated. And if you really want to talk about constitutional maximum, that maybe it should be less than that. So. Well, obviously, we disagree on it. I think, and I would go back to the principles laid down in Planned Parenthood in just two points. One, the district court's job, and any court's job in reviewing this, is to correct any constitutional excess, if there is any, and to go no further than that. Reducing a jury's award on constitutional grounds below that and making it arbitrary low is just as offensive to the Constitution as a grossly excessive award. Well, there's no constitutional minimum. No, but in reviewing a jury's award for whether it's constitutionally excessive, a court's job is to determine just that and to correct the excess. That's what the Leatherman case said. That's, and I don't, I mean, I don't think the defendants even really dispute that principle. In fact, this Court's most recent decision in the Wright v. Ford Motor talks about the constitutional ceiling. That's where the Court should go. So then we have Planned Parenthood that lays out, I think, a helpful framework for courts to act more on principle than on arbitrariness at the judge level. And it lays out this framework. And we would submit that because of the egregious nature, because Dr. Levy suffered real harm from this letter, I mean, again, it was a life-changing letter, that this falls within the second category of the Planned Parenthood framework, within the five to nine type of ratio. And again, it's important in this area for courts to act on principle, to act in accordance with the law. And the bottom line on that issue in this case is that on these facts, the jury's award was not constitutionally infirm, that the defendants have no due process right. And let me emphasize that again, because that's what we're talking about, no due process right to have the jury's award reduced. And by reducing it, and dramatically so, we submit that the district court erred in the other direction, that rendered award arbitrarily low, which, again, is just as offensive to the Constitution. Cooper and State Farm both said that exacting appellate review is necessary to ensure that a punitive damages award is based on an application of law, not a decision maker's caprice. And in this case, the application of the law required leaving the jury's award intact. And unless the Court has further questions, I'll save the remainder of my time for rebuttal, but I'm happy to discuss this. It's fine. It's fine. Thank you. Mr. Tiger? Mr. Taggart. Excuse me. Your button. Thank you. I had to make sure it was the right button. Thank you, Your Honor. I know the Court's predominantly interested in the excessiveness issues. I just want to quickly touch on the instructional issue, but I promise I'll get to the others very quickly. What instructional issue? The Judge McNamee declined to give an instruction. Oh, I'm sorry. Thank you. And, you know, it's undisputed in this case that it was a correct statement of law. And I think that this Court's decision in the White case shows why it was an important instruction for us to have. Mr. Tiger, what was your theory? You didn't raise bad faith as a mutual bad faith. You didn't raise his bad faith as an affirmative defense. So what is it that you thought you could get by an instruction that you didn't get by being able to argue it? I don't understand. Well, I think if the jury doesn't hear from the judge that that is the law, it's less likely to believe us when we tell it it's the law. And so what we wanted to get was some appreciation that the failure to do anything in response to this letter, which they claim was this life-changing letter, which expressly invited Dr. Levy to contact Ms. Conrad if he had any questions or concerns or thought she was misunderstanding anything. He was already represented by one of the best bad faith lawyers in the whole state of Arizona. The standard practice, if you get a letter that you think is denying a claim, is to raise bloody murder. Instead, they went out and sued because they knew. They got you. This was a badly written letter, and they realized that this was going to be a very good piece of evidence in a lawsuit. So what we wanted was the ability to tell the jury that they have an obligation to us, too. It might have impacted the liability findings, the bad faith liability, the punitive liability, which, as the Court knows, is under a very searching standard. And then it might have mitigated the damages. And that's really where White comes in. White recognizes that the plaintiff's conduct can have a mitigating impact on the degree of reprehensibility of the defendant's conduct. Well, wouldn't the evidence have to be such that there was some possibility that he had not acted in good faith? A failure to answer a preposterous letter, certainly there's no duty to do so. And I suppose the district court thought there wasn't any possible evidence of bad faith on Levy's part. Judge Fletcher, I don't think that was the basis for Judge McNamee's ruling. He just didn't think it was the kind of thing that he needed to instruct on. But he understood why we wanted it. He didn't disagree that we should be able to argue that much of his problem was of his own doing. We concede, as we've repeatedly conceded, that it was a very badly written letter. But there were portions of it that were valid. And if he thought he was having his claim denied forever, you know, all he had to do was send a letter or pick up the phone, and it would have — either they would have explained it to him, in which case this case wouldn't be here at all, or they would have said, yeah, you're right, you're out of luck, which is not our position, of course. But it would have clarified matters considerably. And all we wanted with the instruction is the ability to tell the jury, yes, he, too, had an obligation of good faith. And the evidence in the case — Instead of — your point is bad faith was instead of writing you a letter or telling you on a phone, I disagree with you, he brought a lawsuit. That's bad faith? It's a — yes. I mean, the bad faith not in the sense of a cause of action, Your Honor. Simply, you know, there's a — That wouldn't fly as bad faith as far as I'm concerned. Well, it's not in terms of — it's not a cause of action. It's simply you have to look at both parties' conduct, and they each have a duty of good faith to the other. And if you thought that a letter was unfair, wrong, shouldn't have terminated your claim, you do have an obligation to your counter-contractual — Well, where do you find that anywhere in the law? Well, it's an implied duty in the contract. An implied duty in the contract? What court has ever said that's an implied duty in the contract? You can't bring a lawsuit. You have to write a letter first. Well, I mean, every case is sui generis. I don't know that I can — we've never had a case with these facts. Have you ever heard of a case going that way? I have never heard of a case where a person who's getting $4,000 a month in benefits receives a letter from the insurer and then just assumes that it's a denial and files a lawsuit. In every case I've ever been involved in, there's been correspondence back and forth. There's been you misunderstanding the evidence, this is unfair, there's been a threat of a lawsuit. Well — Maybe I'd better move to the next issue, because I don't think I'm getting very far with this one. I don't think you are. I think — I'm not sure, but I think, Judge Fletcher, you were getting at the question before, is the compensatory award excessive? And we certainly think it is. As Judge Rimer pointed out, we're talking about a few months of anxiety over whether he would get his benefits paid. There was no evidence of severe emotional distress, like a nervous breakdown or a suicide attempt or post-traumatic stress syndrome. It was just six months of concern about his benefits. Then, of course, he got the letter saying everything was back on track. After the lawsuit was filed. Yes, but that's a separate issue. I mean, you could — Well, I mean, it really isn't, because you're trying to take advantage of the fact that he didn't suffer any loss of benefits. But the reason that he didn't suffer a loss of benefits, the jury could well find, is after he got sued and Unum sat back and said, oops, maybe we better try to rectify this. But the purposes of compensatory damages are merely to make him whole. So if he didn't suffer it, if you assume, as your question does, that this was just us responding to the lawsuit and cutting our losses, the fact remains that he didn't suffer very long. And compared to, you know, Planned Parenthood as an example, all kinds of cases where there is really severe emotional trauma, a million point two for what he suffered, where there's really almost no evidence in the record of any severity to it, is, I submit, shocking. Now, just quickly, you know, there was the reference, and we think that Judge McNamee was valuing at $200,000 the relapse and the broken hand. And we've explained in our brief why we don't think that there was any sort of causal link between the denial letter and those events. And I just want to emphasize that Levy himself never said that the letter was the cause of his desire to obtain narcotics, which is what led him to break his hand and have his relapse, and nor did any of his doctors. So it's a very attenuated chain to, and we think inadequate, you know, inadequate to support any amount of damages. So we submit on the compensatory damages that they should be further reduced. Now, on to the punitives. I think if you want, I think, Judge Reimer, you're exactly right, that you have to sort of view this in perspective. And this is not Planned Parenthood. It's not Hillel. There are all kinds of cases where the conduct is objectively far more reprehensible. And what I think the Supreme Court is asking, and I think what Planned Parenthood had in mind, was you place conduct on a spectrum. And these factors that everybody's been briefing and which the Court discussed in Planned Parenthood, they're tools, but it's not some checklist where you're supposed to go down the list and either check the box or not check the box. Well, in fact, the district court pretty much did it. I mean, to the extent that you can say we laid out a road map in Planned Parenthood, the district and the district court followed the road map. And the district judge who was sitting there saw the trial, got the vibes, you know, saw the eyebrows twitching or somebody hot under the collar, whatever, made an informed and reasoned and very experienced, in his case, judgment call that one point, I mean, $3 million was appropriate. So what is your best argument for why that's not correct? It's essentially at the end, the low end of the possible ratios. It's not one-to-one, but it's close. And as I said, a very experienced district judge made that judgment call. Well, I think one of the things that he failed adequately to consider is the deterrent effect of the other damages that were awarded. This is a case in which the plaintiff never lost any of his benefits. So all of the damages that were awarded here in a sense were punishment to us already. The Supreme Court made that very clear in State Farm when discussing emotional distress damages. And, you know, even if you don't agree with us that 1.2 is shocking, surely I think you would have to agree that that has a very significant deterrent and punitive effect and in a sense replicates the punitive damages just as the Supreme Court explained in State Farm. But it doesn't end there. The future benefits are also in a sense punitive because it means we've got to pay him every penny for the rest of the term of the contract, no matter whether he gets better or not. We're obliged to do that to begin with. Well, that's apparently they don't want to do that. I understand that. But, you know, that's that I don't understand. Well, I mean, it takes out. Well, if that was what the pitch was at trial, then I'm not surprised that they came in with 15 million. No, it wasn't the pitch. It's just as a practical matter, future benefits are even awarded or awardable only in a bad faith case. They're not awardable for mere breach of contract. So it is already understood that they are quasi-punitive. It means that we never have the chance. If he were to die tomorrow, his estate would get the whole thing. Even though if he were on contract, they wouldn't get any more. If he were to go back to if he were cured, if he actually had the treatment that Doctors Obitz and Stonington thought he had should have and got rid of his underlying anxiety disorder and was able to go back to dentistry and did so, he'd still have this money. So that's why we think it does have a deterrent effect.  And I think, you know, in the Glynn case, Your Honor, which you decided about 15 years ago, I think, and it's a long time. It's a maritime case, if that helps any. But you recognized that attorney's fees serve the same purpose as punitive damages. From the defendant's purpose standpoint, it's a deadweight loss. It comes out of our pockets and it has the same deterrent and punitive effect as punitive damages do. So that's one, I think, important thing that Judge McNamee didn't consider, is that in the Supreme Court, you know, Mr. Hudson is focusing on notice being sort of the central concern of the Supreme Court's punitive damages jurisprudence. And there's no question then in BMW the Court did emphasize notice. But another issue, another factor that the Court discussed, both in BMW and even more in subsequent cases, is a punishment is arbitrary and violates due process when it goes beyond an amount reasonably necessary to punish and deter. They use that language in BMW itself, in State Farm, and we may hear more about it in Exxon. We'll see how that case gets decided. Should be within a month or so. So here what we think is that given the other kinds of damages that have been imposed, given the nature of the conduct, and I would like to mention that it's not true that they're an unrepentant wrongdoer, which is what's alleged in the briefing. For one thing, if you look at pages 14 to 15 of what we call the defendant's further excerpts of record, all three of the executives whose memos were the centerpiece of their bad company case have long been removed from the company. In addition, the testimony was that in 2003, which was before the trial, the claim manual was revised to require much greater documentation of the roundtable reviews. So it's simply not true to say until you hammer them with a multimillion dollar punitive award, they're never going to change their conduct. The conduct has already been changed. When you add to that the fact that we've got all of these other damages, I think that even a one-to-one ratio is too high. You know, there's evidence about what the company has done. It may be very laudable, but it's not really part of the record. Well, you're referring to the ‑‑ You're saying that Unum has really reformed, it's got ridden of these bad guys, it's changed its methods. Well, that is in the record. That was testified to. Was that in the record? Yes. If you look at the pages of the further excerpts of record, that ‑‑ Oh, it's in that. Okay. That, yeah. Now, what you're probably referring to is in our briefs, we talked about the regulatory settlement agreement, which has happened subsequently. And it's true it's not in the record, but recently they got a complete and total clean bill of health from the regulators who have basically said they are a model company now. So whether you want to take judicial notice of that, I don't know. But I think even if you don't, there's enough. If we're going to take judicial notice of that, we should possibly take judicial notice of the fact that every time I turn around, there's another case against Unum. It makes wonderful life for you, but it's out of their pocket the same way as, you were complaining about attorney's fees out of our pocket before. You mean it's out of whose pocket? You. I assume that you were talking about Unum's pocket. Yeah. I'm not understanding what ‑‑ Oh, forget it. You're talking about ‑‑ Forget it. Sorry, Your Honor. But those cases arise out of these older practices, which, as I mentioned to Judge Fletcher, have been addressed and it's in the record. So if anything, the fact that there have been these other suits and we've had to pay damages in those suits, that should be considered in terms of whether any more is needed. When you add our compensatory damages here, I don't think we're seeing eye to eye on that. No, I don't think we are. Let me just say one thought about the third guidepost. There's been a disagreement between us and Dr. Levy over the application of the third guidepost, which has to do with fines for comparable conduct, legislatively established fines. The purpose of the guidepost, I think, is to get an objective indication of what expert legislators and regulators think is appropriate punishment for comparable conduct. Well, the district court, I guess, agreed with you. Yes. It contrasted with Dr. Levy on losing the license as being a relevant consideration. The district court did pick out several Arizona statutes, which I don't remember the exact figures, but it's like capped at $50,000 or something for six months for violations of the insurance code. Right. I think the number of these. So what? Are you squawking about what the district court did, or are you going back to the dispute with Dr. Levy on losing the license? Well, I wanted to make sure we don't lose that dispute here. Okay. I just wanted to be sure who you were taking issue with. Well, it's both. On the one hand, I want to make sure that the court agrees with us that the loss of the license is not a punitive and unprecedented as to not be worthy of consideration. And I want to cite the court to its own language from the Leatherman v. Cooper Industries case, where it rejected similarly unrealistic efforts to increase the size of the comparator. Counsel, I want your view on one point. Is the district court required once we decide punitives are in order? To give the constitutional maximum? Is that an obligation of the court? I think the problem that we're having here is that there's no ratio safe harbor. I think that. Well, I'm just assuming. I don't know quite how one would determine the constitutional maximum. But just as a theory, let's say the constitutional maximum can be determined. Is it the obligation of the court to do that? Well, I think the court either has to do the constitutional maximum or use its Rule 59 powers to go below it. I think that Judge McNamee, he and the plaintiffs didn't quite see the issue the same way. But I think if you were to ask him, he'd say, yes, this number that I came up with is the constitutional most that you can be punished. What he was disagreeing with them was they were suggesting 4 to 1 is some bright line, safe harbor rule, and that he could not go under it, under Planned Parenthood. And that's where Judge McNamee disagreed with him, and I think he was exactly right about it. Thank you, Your Honor. Okay. Thank you. Thank you, Your Honor. Let me just pick up, if I may, with that constitutional maximum issue in your question, Judge Fletcher. That is the obligation of the district court. In fact, the defendant's brief. From where? What's your authority? Where? Where does it come from? Well, it comes from, I guess as a minor point, the defendants acknowledge that on page 74 of their answering brief, where they say, a court's job in reducing award on constitutional grounds is not to go below, quote, the maximum permitted by the Constitution. And the source comes from the due process clause, that it's a question of law whether you, whether a jury has, whether a defendant has a due process right to have the jury's award reduced. In Cooper, the court ---- Here's the point I guess I just don't understand with the concept. If the district judge says, as this judge did, it's the flip side of the question I was, the conversation I was having with Mr. Kibler. You've got an experienced district judge who's sitting there, went through the whole proceeding, and says, you know what? I think $15 million is off the charts. I think 3, even though I might not have done it, I think 3 is okay. And 3 is constitutionally permissible. If I may, Judge Ryan, this is de novo review, and it's a question of law. So the note, what your question is sort of presupposing ---- Some of it is and some of it isn't. The application of the constitutional guideposts may be de novo, but the district court's fact findings we review for basically deferentially. And also you have to accept the jury's verdict and the findings that go into that. I completely agree with that. Okay. So legally, where that comes from is the very concept of where, how courts are involved in this business. And I would direct the Court to the Cooper's decision, where on page 435 the Court said the question is whether that line has been crossed. That's the words. And the line they're talking about is the constitutional line. Of course. But that's going in this direction. You want us to go in the other direction. Well, what I'm suggesting is that when a court interferes with a joint ---- when a court decides we're going to correct a jury's award on constitutional grounds and we're going to reduce it for that reason, it can remove the constitutional excess but no more. And that really goes to the point that Mr. Kagan was making. Let's suppose this. Suppose that everything else was just the same and the district judge said, here, I think that probably the remediator on punitive damages should have been $10. Now, constitutionally, let us suppose it had been perfectly proper to go up to 3 million. He says, it ain't worth it. It's not there. The evidence does not support an award beyond $10, $100, $1,000, filling the blank. Anything below 3 million. Okay. You surely are not taking the position that that was constitutional error because he had to go at 3 million. Well, let's ---- Are you? I believe I am. But what I'm saying is ---- That's what I was afraid of. Well, it's not, Judge, it's not a crazy concept, and it is what the law is. So let's, you know, let's help to educate each other. Here's the distinction, is that what you're honing in on, and this is the point Mr. Tager made, is courts do have power when raised, when a party objects under Rule 59, under State law accessiveness grounds. That courts have a great deal of discretion. Okay. And that's when you say, that's when it's appropriate for an appellate court to say, you know what? The court was there. We're probably not going to touch it. That's what we have with the Emotion Award. That's where the review is discretion. You say, you know, that's where district courts are going to defer their findings. They're there. They can figure it out. The constitutional question, though, is a legal one. And that was the basis for the reduction in this case. The Rule 59, and let's ---- let me continue with this point. The defendants never objected to the jury's award on State law grounds. That wasn't raised in their post-trial briefing. The only ground they asked for, the only basis for the reduction was constitutional. When the judge then reduced the award, the initial order did mention the State law grounds, but ultimately the reduction was based on constitutional. We filed a motion for reconsideration, and we laid out the law that said, Judge, if you reduce it on constitutional grounds, as opposed to State law grounds, just enter a judgment. Because it's a question of law, there's no Seventh Amendment issue. The case law is consistent on that. The judge then enters the final order in this case, and that's at docket 279. And the district court said, plainness ---- the court accepts plainness reading of the relevant case law concerning the Seventh Amendment and remitted her as to punitive damages. It is ordered that the clerk shall enter an amended judgment reflecting the court's reduction of the punitive damages award, which was determined by the court to be unconstitutionally excessive. Okay. So that's the sole basis for the reduction. And again, because it's a question of law, to go below when you're talking about the constitutional issue and the due process issues, to reduce a jury's award on constitutional grounds below the Constitution is just as offensive to the due process clause as an award above it. That is something that the defendants have no due process right to. The district court found that the constitutional maximum was $3,000 ---- $3 million.  And so that's where I disagree. Kagan. Well, that's where I disagree. I know you disagree with it. But ---- but if you look at the district court's order, the district court is saying ---- isn't saying I'm setting it to the constitutional maximum. The district court said I reject that. I'm not going to set it to the constitutional maximum. That's where I come in a little unglued. Well, let's look at page 7 of the district court's order where the court then gets to it. It says, finally, with respect to ---- and this is responding to our motion for reconsideration. Finally, with respect to the ratio assigned by the court, plaintiff argues that this court must remit plaintiff's punitive damages award to the, quote, constitutional maximum. And we cited Leatherman because that's what Leatherman said. That's what the other ---- that's what ---- I think that's binding precedent in this case. And the court says the court disagrees with plaintiff's contention. Leatherman was decided without the benefit of State Farm. So the district court is flatly rejecting this notion that you have to go to the constitutional maximum. And that, in our view, is unconstitutional. The court doesn't have the power to do that under the Constitution. The court can correct the constitutional excess. The defendants have a due process right to have the constitutional excess removed, but they have no constitutional right, no due process right under the Constitution to have any more than that amount removed from the jury's award. That's what the law says. And the district court in this case dared. It failed to apply the law. Thank you. I do have a minute, so if I could maybe just touch briefly on the other issues. Tell Joe, sir. Well, I want to be respectful of the Court's time. I guess on the ---- I think the Court got the jury instruction issue. There was no breach of legislation. It's not even the joint pretrial statement. This notion that he mentioned about state interests, that's really a pushback on the ratio of factors if you look at BMW. And, again, we've seen that that is clear. The civil loss of license point, just briefly, that goes to notice. There's no issue here. They don't even dispute that that was a potential penalty in this case. And, again, if you have notice of that, there's no due process issue here with respect to the jury's award. Thank you very much. Okay. Thank you. Thank you, Mr. Hudson. I appreciate your help in this case and your argument. And the matter just argued will be submitted. Are you still okay to go with the next one? Are you okay? Keep going?
judges: Fletcher, Rymer, Duffy